## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

DAILANE INVESTMENTS LIMITED

v.

HIG CAPITAL LLC and
SAMI MNAYMNEH

**COMPLAINT**

Case No. 1:25-cv-20568-RKA

Plaintiff Dailane Investments Limited ("Dailane") through its attorneys, Sequor Law P.A., alleges as follows:

### NATURE OF THE ACTION

1.      HIG Capital LLC ("HIG") is a powerful and profitable private equity fund, with over $65 billion of capital under management.  HIG and its affiliate, HIG Europe, acquire companies for their funds' portfolios, and, when the time is right, those companies "exit" the fund in a sale that usually yields HIG Capital and its investors an impressive profit.

2.      HIG's CEO, Sami Mnaymneh ("Mnaymneh"), claims that in any exit deal, its "goal is to obtain the highest possible price for the assets being sold" and "maximize the returns for all of their investors."  But the facts of this case show that when given the choice between itself and its investors, HIG chose itself.

3.      This action seeks to recover damages incurred by Dailane on account of this choice. Specifically, Dailane seeks to recover damages arising out of HIG's and Mnaymneh's aiding and abetting a breach of fiduciary duty to Dailane by selling assets from one HIG fund to another at a price that was a windfall to HIG and unfair to Dailane.

1

4.      Mr. Maillis is the founder of Maillis International S.A., the corporate umbrella entity for several successful companies in the business of manufacturing and distributing packaging systems (collectively referred to as the "Maillis Group").  By 2015, H.I.G. European Capital Partners GmbH ("HIG Europe") had purchased the entire share capital of the Maillis Group via its affiliate, H.I.G. Luxembourg Holdings 46 S.à r.l. ("HIG46").

5.      Mr. Maillis retained an indirect ownership interest in the Maillis Group, through Dailane, which had a 14.925% share of ownership interest in HIG46.  This interest was held by a special purpose vehicle called H.I.G. Luxembourg Holdings 47 S.à r.l. ("HIG47").  In a Fiduciary Agreement dated April 11, 2016, Dailane granted HIG47 the right to act on its behalf with respect to its interest in the Maillis Group.  This grant gave rise to a fiduciary duty to be the faithful steward of those assets, to act in Dailane's best interests, and to deliver relevant, complete, and accurate information with respect to those assets.  Per the Fiduciary Agreement, HIG47 was bound not to sell the Fiduciary Assets—Dailane's shares in HIG46 or HIG46's participation in the Maillis Group— "other than on arms' length terms."

6.      HIG Europe likewise owed a fiduciary duty to Dailane.  Its executives were members of the Maillis Board, as was Mr. Maillis, and HIG Europe had a duty to act in the best interests of the Maillis Group and its stakeholders.  This duty includes providing all relevant, complete and accurate information relating to any proposed sale of the assets to board members or their affiliates.

7.      The same executives, acting on behalf of HIG Europe, entreated Dalaine, through Mr. Maillis, to continue their "trusted relationship," inducing it to rely on their representations.

8.      Dalaine placed its trust in HIG and HIG Europe.  It should not have done so, because neither were acting in Dailane's best interests.  Rather than sell the Maillis Group to a

third-party buyer in favorable conditions, HIG, by and through its CEO Mnaymneh, proposed the "flip" of the Maillis Group from the existing HIG fund ("Fund I")[1] to a new fund just launching H.I.G. Europe Capital Partners III ("Fund III") based on a third-party bid that had been deemed "a joke" by HIG Europe.

9.      As it turns out, the joke was on Dailane and the other investors in Fund I.  As both buyer and seller of the asset, HIG could fix the sale at a low price and bestow on Fund III a highly valuable asset without paying nearly full price for it, costing Dailane millions in profits that would have been obtained if HIG47 and HIG Europe had upheld their fiduciary duty.  By and through its its CEO Sami Mnaymneh, HIG proposed, encouraged, and approved a deal that caused a breach of fiduciary duty and is therefore liable for aiding and abetting the underlying breach of fiduciary duty.

10.      By this action, Dailane seeks to recover damages from HIG and Mnaymneh for losses arising out of its aiding and abetting a breach of fiduciary duty.

## THE PARTIES AND RELEVANT ENTITIES

11.      Plaintiff Dailane is a limited liability company incorporated in Cyprus.  It is wholly owned by Inlinsio Capital Raif, which is in turned owned by Michael Maillis, his wife, and his three children.

12.      Michael Maillis is a citizen of Greece and founder of the Maillis Group.  At all relevant times, he acted as Dailane's representative vis-à-vis the HIG entities listed in the paragraphs below.

---

[1] Fund I is made up of two separate HIG entities: (i) H.I.G. Europe Capital Partners L.P., which owned 51.43% of HIG47 through its wholly owned subsidiary H.I.G. Europe – Maillis Limited, and (ii) H.I.G. Bayside Debt & LBO Fund II, L.P., which owned the remaining 48.57% of HIG47.

13.     Defendant HIG Capital LLC ("HIG") is a global investment firm headquartered in and operating from Miami, Florida.  It is incorporated in Delaware.

14.     Defendant Sami Mnaymneh ("Mnaymneh") is, upon information and belief, a resident of Florida and a citizen of the United States.

15.     Related non-party HIG European Capital Partners GmbH ("HIG Europe") is a German entity.  It is an affiliate of HIG.

16.     Related non-party HIG Luxembourg Holdings 46 S.a.r.l. ("HIG46") is a Luxembourg entity ultimately owned and controlled by HIG.  It was the holding company for the Maillis Group.

17.     Related non-party HIG Luxembourg Holdings 47 S.a.r.l. ("HIG47") is a Luxembourg entity ultimately owned and controlled by HIG.  This entity held Dailane's interests in HIG46.

## JURISDICTION & VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Dailane is incorporated in and operates exclusively in a foreign state and HIG and Mnaymneh are citizens of the State of Florida.  Venue is proper because HIG is based in Miami, Florida and Mnaymneh resides in Coral Gables, Florida, which are in this district, and the actions giving rise to the cause of action against HIG and Mnaymneh occurred in this District.

## FACTUAL ALLEGATIONS

### *Flip Transactions Between Private Equity Funds*

19.     Private equity funds acquire companies with the intent of increasing their value over a period—five, seven, or even ten years—and then selling them for a profit.  The fund solicits investments from investors who become limited partners in the fund.  The capital is used to acquire

4

companies.  The principal aim of the fund is typically to improve the financial performance of the companies during the life of the fund before the fund "exits" that investment and sells the company. Any returns from sale of the assets held by the fund are then distributed to the limited partners.

20.     Because the acquired companies are privately held, whether they increase in value and by how much is generally not known to the public.  The investors only know what the fund managers are willing to tell them, thus allowing fund managers to manipulate messaging on asset value and performance.  And, because privately held companies do not trade stock publicly, an investor cannot discern what the market would be willing to pay for the asset at a given point in time until an independent third party offers to buy it.

21.     A third-party bid may or may not reflect the true market value of an asset.  It might not reflect the fair value of an asset if, as was the case here, the private equity fund failed to provide sufficient historical or audited financial information or the company's performance dramatically improved during the bidding period.  For these reasons, a private equity fund might reject third party bids and wait to sell the asset when it has the financial data to show the actual value of the asset, that is, if they are motivated to receive a higher price for the asset.

22.     In recent years, there has been a growing trend of private equity funds selling assets from one fund to another under the same corporate umbrella.  These transactions, called continuation funds or secondary transactions, or, in this case, a "flip", present a direct conflict of interest between the investors in the selling fund and the investors of the acquiring fund.  The competing interests of the buying and selling funds are managed exclusively by the private equity fund, which is on both sides of the transaction.

23.     In this case, the conflict of interest presented an opportunity for HIG Europe, which had exclusive control over the information given to investors and third parties, to sell the asset to

itself for a lower price than its fair full market value.  This cost the original investors of Fund I, but benefitted Fund III's managers because:

    a.   They were able to receive additional management fees on the same asset;

    b.   They could guarantee favorable performance fees, or carried interest, for themselves because the actual value of the asset is more than what they charged themselves for it; and

    c.   The promise of more fees for themselves led the fund's managers to forgo better exit options.

24.     It is standard practice to offer limited partners in the selling fund the option to roll over their investment in the underlying asset into the new fund, so that they may realize the full gain on that asset.

25.     While Dailane does not know whether the limited partners in Fund I were offered the opportunity to roll over their interests in the Maillis Group assets, at no stage during the exit process was Dailane offered such an option.

26.     The way to prevent funds from selling assets to themselves below value is well known:  require an independent valuer to produce a fairness opinion and distribute that opinion to the investors.  In August 2023, the Securities & Exchange Commission proposed exactly this in a new rule.  A Fact Sheet on several new rules intended to protect private fund investors described the rule as follows:

**Adviser-Led Secondaries Rule**

The proposal would require a registered private fund adviser to obtain a fairness opinion in connection with an adviser-led secondary transaction. In these transactions, advisers often offer existing fund investors the option to sell or exchange their interests in the private fund for interests in another vehicle advised by the

adviser. An independent opinion provider would opine on the fairness of the price being offered to the private fund for any assets being sold as part of the transaction. The proposal also would require the adviser to prepare and distribute to the private fund investors a summary of any material business relationships the independent opinion provider has or has had within the past two years with the adviser or any of its related persons. This requirement would provide a check against an adviser's conflicts of interest in structuring and leading a transaction from which it may stand to profit at the expense of private fund investors.

27.     The SEC also proposed that private fund advisers inform investors of the value of their investments on a quarterly basis.

28.     The SEC's effort to regulate private funds was met with fierce opposition by the National Association of Private Fund Managers and others.  In a successful challenge filed in the U.S. Court of Appeals for the Fifth Circuit, they contended that private funds are not subject to regulation because the SEC may only regulate the relationship between an investment adviser and a fund and may not regulate what private fund advisers disclose—or do not disclose—to their investors.

29.     The Fifth Circuit vacated the SEC's rules for private funds in June 2024.  But even without a regulatory scheme, private funds and their advisers may not lie to their investors through misrepresentations and/or omissions, especially not where the private fund advisers act as fiduciaries to certain investors, like the Plaintiff in this action.

*The Maillis Group*

30.     The Maillis Group was founded in Greece in 1968 by Michael Maillis and is the second largest manufacturer of end-of-line packaging equipment in the world.  Over time, the Maillis Group expanded its production sites, product lines, and customer base, eventually opening offices in 18 countries globally.  It supplied packaging for an array of industries and companies

that are household names, including Amazon, Pepsi, Nestle, Mars, P&G, Walmart, US Steel and others.

31.     While the Maillis Group had generated hundreds of millions in revenues, like many other companies, it was forced to seek investment following the onset of the global economic downturn in 2008. It temporarily solved this problem by securing a new credit line from Greek banks and an extension on outstanding loans in exchange for a commitment from the board to submit a plan for capital restructuring.

32.     As the Maillis Group underwent debt restructuring with the guidance of Ernst & Young, reduced operating costs, and increased efficiencies, it became ripe for acquisition.

33.     On May 25, 2012, HIG and Mr. Maillis entered a Memorandum of Understanding (the "MOU") to confirm HIG's intent to direct its funds to acquire the Maillis Group. The MOU stated that Mr. Maillis would own a 15% stake in the total acquired debt and equity position of the Maillis Group post-acquisition.  A revised MOU dated March 27, 2014, reaffirmed the same.  Both MOUs were signed by Mnaymneh on behalf of HIG.

34.     HIG Europe executed a "comprehensive debt and equity restructuring agreement" with the Maillis Group's lenders in June 2014; in February 2015, HIG Europe purchased the entire share capital of the Maillis Group through its affiliate special purpose vehicle, HIG46, a private LLC incorporated and existing under the laws of the Grand Duchy of Luxembourg.  At the time of the sale, the Maillis Group assets consisted of many international packaging companies, including Wulftec International, Inc., Greek company M.J. Maillis S.A. ("MMS"), Italian company Societa' International Applicazioni Techniche S.p.A. ("SIAT"), Polish company Marflex M.J. Maillis Poland SP Zo.o. ("MPS"), and others.

*The Fiduciary Agreement Between Dailane and HIG47*

35.    As contemplated by the MOUs, Mr. Maillis maintained an interest in the Maillis Group through Dailane, which he and his family beneficially owns.  Dailane owned 14.925% of the total share capital of HIG46 (the "Shareholding"), which was equivalent to an indirect participation of 14.925% in the share capital of the Maillis Group.

36.    Dailane's interest in the Maillis Group was held by HIG47, another HIG affiliate. This holding was formalized through the Fiduciary Agreement, dated September 29, 2015. This agreement was amended and restated on 11 April 2016, and governed HIG47's conduct throughout the Flip transaction.

37.    The Fiduciary Agreement defines HIG47 as "the Fiduciary."  In the Fiduciary Agreement, HIG47 "acknowledges that it holds the Fiduciary Assets on behalf of [Dailane]."  The Fiduciary Assets included the Shareholding.

38.    HIG47 likewise undertook that it would "not dispose of, including by way of transfer, sale, redemption or otherwise, of the Fiduciary Assets and HIG46's participation in Maillis S.A., other than on arms' length terms."

39.    The Fiduciary Agreement is governed by the laws of Luxembourg. Under Luxembourg law, directors of private limited liability companies must perform their fiduciary duties in the best interest of the company or person they are representing.

40.    After execution of the Fiduciary Agreement, Mr. Maillis was appointed as non-executive chairman in the Maillis Group board of directors.  The board also included HIG Europe executives, who had appointed most of the other directors.

*The Unsuccessful Auction of the Maillis Group Companies*

41.     In December 2018, the shareholders of HIG47, which included HIG Europe–Maillis Ltd. and HIG Bayside Debt & LBO Fund II, L.P., put HIG47 into voluntary liquidation in Luxembourg.  HIG Europe and its executives, Wolfgang Biedermann and Christian Kraul-von Renner, controlled HIG47.

42.     At the same time as HIG47's liquidation, HIG Europe began to sell companies within the Maillis Group, starting with Wulftec International Inc., the second largest manufacturer of end-of-line packaging equipment in North America.  In August 2020, HIG Europe effected the sale of MSS, a US polyester strapping producer of heavy-duty packaging to a company based in Greenville, South Carolina in August 2020.

43.     The rest of the Maillis Group was not yet ripe for the market, because they had undergone a radical operational restructuring in 2019, the consequence of which was that none of the remaining Maillis Group entities—SIAT, MMS, and MPS—had an audited financial history to help potential buyers or their lenders meaningfully understand their value or past performance.

44.     In early 2020, HIG Europe attempted to sell the remaining Maillis Group entities, but quickly abandoned this effort because the lack of available financial history made the entities unappealing to buyers.

45.     Despite knowing full well how the lack of financial history impacted any effort to sell the Maillis Group entities, HIG Europe nevertheless recommenced the effort to sell the remaining Maillis Group companies in late 2020, now with nearly one year of financial history.

46.     The financial data provided to potential buyers was not fit for purpose. Ernst & Young produced a Financial Factbook, but it was provided without reliance, meaning that it

disavowed any duty of care to the potential purchaser.  Financial information provided without reliance makes it harder for potential buyers to obtain financing for an acquisition.

47.     Although there was not enough data to show it, the remaining Maillis Group companies were performing very well following the restructuring in 2019.  In the first six months of 2021, SIAT's EBITDA rose significantly, from €11.9 million to €18.1 million.  HIG Europe believed that this increase "seem[ed] to be of sustainable nature."

48.     In its renewed effort to sell the Maillis Group, HIG Europe elected to proceed via an auction process; it appointed Harris Williams, an investment bank specializing in mergers and acquisitions, to run the auction.  Harris Williams targeted 126 potential strategic and private equity buyers; 50 expressed interest in acquiring at least one of the companies and signed non-disclosure agreements.

49.     The auction launched in April 2021.  It attracted little concrete interest.  Harris Williams received feedback from potential buyers that the lack of financial history for the restructured Maillis Group entities was why they did not submit letters of interest.  Harris Williams passed this message along to HIG Europe on or around June 9, 2021.

50.     HIG Europe was acutely aware that the absence of historic performance between 2018 and 2020 could be a "killer" for a buyer; Kraul von-Renner acknowledged this fact in emails with Harris Williams in June 2021.

51.     The only letter of interest received in acquiring SIAT, MMS, and MPS together came from Greenbridge, an entity backed by the Houston, Texas-based Sterling Group L.P., a private equity firm (together, "Sterling").  Sterling and HIG had experience negotiating with one another.  Sterling had purchased Maillis Strapping Systems USA in August 2020, and in late 2021, HIG closed a deal to acquire U.S.-based Time Manufacturing from Sterling.

52.     Sterling expressed interest in acquiring SIAT at an enterprise value of €170-185 million; MPS at €45-55 million; and MMS at €10-11 million.  That is, it placed the value of the three between €225 million to €251 million.

53.     Mnaymneh solicited information on the bids from the HIG Europe team.   In response to Sterling's non-binding offer, he said "[w]e should try to orchestrate a sale of the entire business to Sterling at 275."

54.     That did not happen.  Instead, Sterling lowered its valuation in a non-binding offer on June 23, 2021, proposing a €160-175 million value for SIAT.  Harris Williams rejected this offer because "did not show the highest value for each single [Maillis] entity," including and especially SIAT.

55.     After rejecting the initial offer, HIG Europe sought to drive Sterling to up its bid to at least €260 million for the three Maillis businesses, or €10 million more than the highest potential bid as expressed in Sterling's letter of interest.

56.     Sterling did not agree because it was not satisfied with Harris Williams or Ernst & Young's ability to provide the information it wanted.  It reported to HIG Europe that it was "not at ease with the financial data, especially the underlying earnings."

57.     Thus, with only limited information, on July 29, 2021, Sterling made a revised offer of €145 million for SIAT.  When HIG Europe learned that this would be the offer, Kraul-von Renner sent an email "telling [Sterling] not to send in the offer he previewed with us as I know that HIG would not transact at that level." Harris Williams informed Sterling that the offer was not acceptable and that HIG Europe instructed Harris Williams to stop discussions with Sterling altogether.

58.     Mnaymneh conferred with Kraul-von Renner and Biedermann about what to do in light of the lousy offer.  Kraul-von Renner proposed that they could either exit now if Sterling came back with a higher offer or restart the sale process once there were 36 months of historical financials for the Maillis entities.  Mnaymneh responded that it was "no problem to wait for [the] sale but we should recap now in that case."

59.     On August 20, 2021, Sterling sent a revised offer of € 157.5 million for SIAT alone. Kraul-von Renner called this offer "a joke."  On 29 August 2021, Biedermann emailed Kraul-von Renner "I do NOT support the SIAT sale at the current offer! The company is a €20 million EBITDA business!"

60.     The failure of the auction process was foreseeable.  According to Mnaymneh, in a normal sale process, there would be three years of audited financial history.  This aberration from the norm had consequences.  Per Kraul-von Renner, the lack of historical financials "has turned down most of the PE interest in this process."  Harris Williams confirmed the same in feedback from potential buyers.  That there was an EBITDA for only 2020, "no clear view on historical financials" and it was "difficult to value with no EBITDA history" were reasons potential buyers said they chose not to pursue an acquisition of SIAT.

***HIG Rejects Sterling's Bid Because It Is Unacceptably Low***

61.     An HIG Europe presentation deck dated August 2021 contained two options: sell SIAT to Sterling at €157.5 million or recapitalize, distribute a dividend to shareholders, and then wait 18 months for a full financial history and relaunch in 2023, when SIAT would have an estimated enterprise value of €191 million.

62.     From HIG's and HIG Europe's perspective, Sterling's offer was completely inadequate and did not capture the value of SIAT at all.  There was no inclination to accept the

offer at that price.  On August 31, 2021, Kraul-von Renner said this to the Maillis Group CEO Luc Van Damme.  Regarding a potential sale of just SIAT and MPS to Sterling, Kraul-von Renner said "[w]e have had our IC discussion today.  I pushed hard for a sale now.  Under 220m however, I have no greenlight."

63.     The figure that HIG was looking to drive up was for SIAT.  Sterling offered €42.5 million for MPS.  After the Flip was approved, HIG ultimately accepted an offer of €40 million for MPS from Teufelberger.  This implies that Sterling would have had to raise its bid for SIAT to €177.5 million at a minimum for HIG to be willing to consider approving the bid.

64.     On September 1, 2021, Mnaymneh instructed Biedermann to tell Sterling they needed "175 cash," and if they "call our bluff, walk away [because SIAT] will be worth more next year."  He implored the Biedermann that "we need to stop leaving money on the table at exits."

65.     HIG and HIG Europe collectively decided to reject Sterling's offer expressly on account of the price point.  On September 2, 2021, Kraul-von Renner wrote to Mnaymneh and said "Sterling is not moving on price.  As per our discussion we will park SIAT for 12-18 months and do a recap.  For MPS and MMS we still try to find a buyer."

### HIG Decides to Sell SIAT to Itself at the Unacceptably Low Price It Rejected

66.     Just minutes after responding in agreement, Mnaymneh wrote again to propose that "if we like this business and think there is a roll up opportunity, we can also think about flipping it to Fund 3."  Kraul-von Renner responded that he would discuss it with management and noted that it "[w]ill be a sizeable equity ticket based on [the] Sterling offer."

67.     Suddenly, the unacceptably low third-party offer became the price that HIG would use to sell SIAT to itself.  This transaction deprived Dailane of the real value of its investment, but

because SIAT would go to another HIG fund, HIG would not "leave money on the table" because of the low sale price.

68.     At HIG, this is a feature, not a bug.  Mnaymneh testified that he proposed the Flip because "at that price it would be an attractive investment opportunity."  According to Mnaymneh, HIG always uses the highest bid that HIG can obtain from third party bidders for a flip transaction when the auction was "fair and well-run."

69.     Here, it was not.  As everyone at HIG acknowledged, including Mnaymneh himself, there was a problem in the auction of the Maillis Group that had nothing to do with their actual value:  the lack of sufficient audited financial history for the entities, which meant that prospective buyers could not understand the real value of what was being sold.

70.     Compounding the problem was that Ernst & Young's Financial Factbook was provided by HIG Europe to potential buyers "reliance restricted."  This meant that banks could not rely on even the brief financial history provided in deciding whether to provide financing to a potential buyer for an acquisition of SIAT.  When HIG Europe sought financing for its own acquisition of SIAT, it sought a reliance letter from Ernst & Young, noting that "[t]o get reliance will take some more time, but [is] worth it for the financing process."

71.     HIG and HIG Europe got to work on the Flip right away.  On September 18, 2021, Konstantinos Marinakis, the CEO of SIAT, referred to "option 3" in an email to Kraul-von Renner.  Upon information and belief, Option 3 was a reference to the Flip, which the Maillis Board would not be briefed on for another month.

72.     An HIG Europe slide deck labeled Maillis 2.0, dated October 19, 2021, was sent to a group of HIG executives—Mnaymneh included—in advance of the "EU MD Meeting" that day.

The presentation only proposed the Flip, which it recommended "with conviction."  Per the presentation, the "next steps" were to "inform" the Maillis Board.

73.     Even though HIG and HIG Europe were set on the Flip, they still had to obtain Maillis Board approval.  On October 21, 2021, HIG Europe made a presentation to the Maillis Board of Directors, including Mr. Maillis, Dailane's representative and agent.

74.     Although HIG Europe presented three options, in reality, there was only one—the Flip.  The slides presented to the Maillis Board were tailored to favor Option 3 by misleading the Board.  Option 1 was to park SIAT and MMS until the first quarter of 2023, as had been discussed and agreed over email between Mnaymneh and HIG Europe during the summer.  Before Mnaymneh suggested the Flip in September, the draft Maillis Board slide deck stated that Option 1 would include raising "~€75m debt (3.75x leverage) and do dividend recap (~€55m H.I.G. proceeds)."  In the slide deck presented to the Maillis Board on October 21, HIG Europe omitted the debt raising and recap from Option 1 to make Option 3 appear more attractive.

75.     Option 2 was to accept Sterling's offer of €157.5 million.  The valuation chart that reflected that SIAT's offer of €157.5 million had been based on "Locked Box" financial data from December 2020.  The presentation deck did not reflect the most current financial information for SIAT, which would have shown a higher present value for SIAT, and thus why that offer was unacceptable.

76.     HIG Europe also deliberately lower projected values and multipliers for SIAT for the purposes of trying to convince the Maillis Board that they should approve the Flip.  In the presentation slides, HIG Europe used a multiplier of 8.5x for the Flip and told the Board that the valuation of €157.5 million for SIAT was "in line with market."

16

77.    But being in line with market is different from saying that €157.5 million was a reasonable bid for SIAT.  In fact, it was not.  Kraul-von Renner said in an email that they told Sterling that the EBITDA multiple was 10.5x for the last twelve months and that the offer of € 157.5million for SIAT was inadequate because it did not "pick it up at all."

78.    Even worse, HIG Europe concealed the actual multiplier used by Sterling.  Before Mnaymneh proposed the Flip, an August 2021 draft of the Maillis Board presentation indicated that Sterling's final offer used a multiplier of 9.1x-9.7x-10.8x for SIAT, with the variance attributable to cash conversion options and an interest in a joint venture enterprise.

***HIG Manipulates Plaintiff and the Value of the Maillis Group to Hide Its Self-Dealing***

79.    Concerned about the value of Dailane's Shareholding, on October 16, 2021, Mr. Maillis asked for more information from HIG Europe about the next steps after the failed auction process.

80.    Mr. Maillis had heard rumors of a planned flip.  He expressed to Biedermann that he assumed that any flip "where the seller and buyer is the same entity is based on the real present value of the Group. . . . I know you and me are in line on the range of this value, as we discussed the issue recently after the disappointing outcome of the exit process. It is obvious that this happened due to the very poor performance of the European arm of HW and I am absolutely convinced that with the right consultants, we will be able to repeat successfully the exit process."

81.    Biedermann responded not by supplying information, but by reassuring Mr. Maillis to trust him and HIG Europe to protect his/Dailane's interests: "You seem to imply that there are things happenings without you knowing of them and I don't know why this is the case.  Let's continue our trusted relationship."  Of course, things were happening without Mr. Maillis knowing;

HIG and HIG Europe had been working towards the Flip since early September, doing nothing at all to preserve Options 1 or 2.

82.     Each time Mr. Maillis expressed concern about the Flip price, HIG Europe confirmed their fiduciary relationship as assurance that they would not do him or Dailane wrong. In correspondence where Mr. Maillis questioned the inputs being used for the Flip, Biedermann told him that it was good to talk to him about the agreement "in a spirit of mutual trust" and said "I can confirm that [the Locked Box] mechanism is a fair and economically appropriate approach" and encouraged him to accept the proposal as "a balanced and sensible solution to bring our trusted partnership to a mutually beneficial end."

83.     In reassuring Mr. Maillis that the deal was a "commercially fair outcome," Biedermann stated that closing the deal "will be a strong pillar for a lifelong trusted friendship." Thus, on December 21, 2021, Mr. Maillis voted for the Flip on behalf of Dailane, believing that its fiduciary was telling the truth.

84.     HIG Europe was not telling the truth.  Behind the scenes, HIG Europe worked intensively to manipulate the valuation figures to justify a sale of SIAT at €157.5 million, a price which the Maillis Board did not know was deemed a "joke" by HIG.

85.     HIG Europe struggled to make the artificially low price for SIAT work.  In an email dated October 6, Kraul-von Renner explained to Biedermann and Simons that they could not use an 8.0x multiplier for SIAT's value, even if that is what the performance justified, because the "low range of the Sterling deal was 7.8x."  As such, "thanks to the acquisition of the UK pensions (buyout value set at €16m vs. potential cash settle at €10m), a lower value for MMS and other net debt adjustments, we're at 7.6x.  Against this background, we have already reduced the Q3 Maillis

valuation to 7.5x so that we are not selling below book."  A multiplier increase of 0.5x would mean that SIAT was worth an additional "EUR 23MM more equity value."

86.     Biedermann replied that "[w]e can keep the prices, but we must play with the processing costs.  There is no way we can do a flip that results in values below the quarterly mark."

87.     Despite the clear incongruities with trying to make SIAT seem worth less than it really was, Kraul-von Renner remained committed to sell "EXACTLY on Sterling's terms," ensuring that HIG and Fund III would absorb the full value of SIAT at the expense of the original investors. Biedermann replied, "I know that, but the variable is winding down costs…".  Shortly afterwards, Kraul-von Renner stated "And we will do exactly that! Plus difference in UK pension buyout value (if you sell the unit to PE) vs potential cash settlement including uncertainty."

88.     HIG Europe had to find liabilities to attribute to SIAT.  It needed to augment the net debt of the deal to bring down the total value, since SIAT's earnings and cash on hand continued to climb throughout the latter half of 2021.  HIG Europe imposed a figure of €9.5 million of net debt on the transaction, when the net cash position of the Maillis Group as of the time of the share sale in December 2021 was a positive balance of €20.6 million.  That is, there was no debt *at all*.

89.     The Maillis Group's CEO, Luc Van Damme, knew the numbers were wrong too. On December 6, 2021, he wrote to Kraul-von Renner stating that, while he had not shared his concerns with Michael, "I completely disagree with the numbers.  They are diminishing what we have achieved with Maillis."

90.     Van Damme went on to urge HIG to use the actual net debt schedule, which he projected would be more than €15 million cash positive as of December 15, 2021.  He asked which date was being used for the Flip and why his forecast as to the cash flows in December was "not being seen as credible???"  He demurred that "I do not intend to argue against my employer.

Neither do I want to create a negative situation that will stick in my mind in the coming years, instead of enjoying the achievement of nearly multiply by 5 the EBITDA since I took over as CEO."

91.     HIG Europe purported to have obtained an independent valuation report for the purpose of proving that the Flip was a fair deal.  This valuation was conducted at the end of November by none other than Harris Williams, which ran the failed auction and was privy to the fact that no one from HIG/HIG Europe had believed the bids received to be acceptable.  Harris Williams had every incentive to downplay the value of SIAT, since it had already failed at its first assignment of running a successful auction.

92.     Harris Williams nevertheless concluded that SIAT had an enterprise value between €168 and €186 million; the corresponding multipliers were 9.25x to 10.25x based on an EBITDA of €18.1 million.  By every valuation metric—discounted cash flow analysis, leveraged buyout analysis, listed company valuation—the price of the Flip was below calculable value.  Which is to say that the Flip at €157.5 million flunked the fairness test.

93.     Rather than adjust the price upward to the real value, HIG Europe simply directed Harris Williams to lower its valuation.  In response to the Harris Williams report, on November 29, 2021, Simons emailed Harris Williams a markup of the valuation report, with handwritten comments changing the multiplier to 8.5x to 10.0x, without any further comment or explanation.  Harris Williams did as it was told.  As a result, in the final fairness valuation produced by Harris Williams, the updated enterprise value for SIAT was €154 to €181 million, with a multiplier of 8.5x to 10.0x.

### *HIG Deceives the Advisory Board and Internal Conflicts Committee*

94.     At the insistence of Biedermann and Kraul-von Renner, the Maillis Board voted to approve the Flip on December 17, 2021.  But HIG Europe still needed to persuade the Advisory Boards of Fund I and III and Internal Conflicts Committee to approve it.

95.     According to HIG Europe, "our strict compliance regime including the respective Advisory Boards of selling and buying funds prohibits to shift value from one fund to another." HIG Europe was thus careful with its messaging to the Advisory Boards and the Internal Conflicts Committee to hide the magnitude of the Flip's unfairness to Fund I's investors.

96.     In addition to presenting the manipulated Harris Williams valuation report, the presentation indicated that the "highest bidders' valuations for SIAT and MMS" were "attractive exit valuation[s]," and did not disclose that HIG Europe balked at the numbers and had planned to hold wait to sell the Maillis Group later until Mnaymneh proposed the Flip.

97.     HIG Europe knew that there was a better way to mitigate the conflict of interest but was careful not to disclose it to the Advisory Board.  In an email listing the "*Dos and Don'ts*" for the presentation to the committee, Simons wrote don't "[s]ay that handling of deal team is best possible H.I.G. can do to handle conflict but in a good way (e.g., involving Dorotheos, Management providing feedback etc) - could in theory have completely separate deal teams."

98.     The Advisory Board approved the transaction, and the share purchase agreement was completed on December 20, 2021.

### *Aiding and Abetting by HIG and Mnaymneh*

99.     HIG and Mnaymneh were involved in every step of the Flip and, upon information and belief, their approval of the deal both at the outset and before closing was required.

100.     After Mnaymneh proposed the Flip transaction, he remained involved throughout, pushing the deal forward, with full knowledge and intent that Fund III and HIG would be benefitting at the expense of the Fund I and Dailane. The deal required his approval and financing from HIG, which he proposed and authorized.

101.     Mnaymneh ordered HIG Europe to "run the analysis at 145mm", which was the initial bid from Sterling that caused HIG to shut down discussions altogether.  He knew that this figure did not represent nearly adequate value; during the bidding process, Mnaymneh told the HIG Europe team that they should sell the entire Maillis Group to Sterling for €275 million and favored shutting down the auction process when Sterling bid at €145 million.

102.     To help the deal go through HIG's committees, Mnaymneh prompted the HIG Europe team to come ups with a list of "actionable add ons to support a consolidation strategy."

103.     Before the Maillis Board was even presented with Option 3, Mnaymneh directed Kraul-von Renner to cause Fund I to provide the financing for Fund III.  Mnaymneh directed him to make a vendor loan of €16 million to Fund III for the Flip. HIG Europe did so and had to find a way to justify the vendor loan to the Advisory Board since, ordinarily, a buyer does not pay a seller to take its asset.  The list of dos and don'ts for the presentation to the Advisory Board specifically instructed them not the mention that the guarantee for the vendor loan was given by seller, Fund I.

104.     HIG Europe also regularly sought Mnaymneh's input.  In addition to taking his instructing on financing, they sought his counsel and approval on the management fees charged for the transaction and a "potential compromise" in respect thereof.

105.     Upon information and belief, HIG's signoff on the presentations to the Internal Conflicts Committee and the Advisory Boards was required.   Mnaymneh marked up the

presentation deck to the Advisory Board and the Internal Conflicts Committee, striking from the presentation that Sterling had "downward adjusted its initial valuation for no good reason," and that change made it into the final presentation.

106.    John Bolduc of HIG also made edits to the Advisory Board presentation, noting specifically that there needed to be a better explanation for why there was such a discrepancy between the manipulated Harris Williams valuation and the projected cash going to Fund I after closing.  Essentially, he directed them to do a better job explaining why the sale price was so low when SIAT's cash flows were so high.

107.    Despite the need for internal controls, Mnaymneh also implored the team to get the deal signed quickly in order to avoid upcoming tax liabilities, instructing the team, on October 28, 2021: "let's sign this ASAP, even if closing is not for a while. Big tax increase coming in the US! We should schedule [Advisory Board] calls in the next 2 weeks."  HIG Europe accordingly rushed the process through and got the share sale signed in December.

### *The Final Terms of the Deal Drastically Shortchanged Plaintiff*

108.    In the end, HIG Europe saddled the Maillis Group with €9.5 million of net debt, yielding a closing price of €138.9 million.  SIAT itself continued to perform very well through December, and maintained a positive cash flow, as predicted by its CEO.  The net debt figures ultimately used were derived from deliberate choices by HIG Europe to maximize the value of the debts in the remaining structure of the Maillis Group and assign them to the Flip.  For instance, HIG Europe chose to measure pension liabilities at the buyout valuation of deficit—which the board had previously rejected—rather than the accounting valuation of deficit, which nearly doubled the deficit amount to €17 million.  One board member contended that the pension should have been valued at €3.3 million, which is the amount guaranteed to the pension liabilities.

109.     The net debt calculation presented also included an amount for a "success" fee to Harris Williams which was not ultimately paid in full, as well as excessive exit fees and transaction fees for the Flip, even though SIAT and MMS were not exiting HIG Europe at all.

110.     As SIAT had an increasingly positive cash flow through December 2021, projected to go even higher in the first quarter of 2022, HIG Europe's insistence that the fixed purchase price of SIAT and the applicability of the net debt calculations made even less sense.  Van Damme hotly disputed the due diligence report and Ernst & Young's assessment to Kraul von Renner.  When HIG Europe forwarded Mr. Maillis's complaint about the same to Van Damme, he attempted to justify the transaction, relying expressly on the same due diligence reports which Van Damme told HIG Europe were incorrect.  Van Damme had been invited to reinvest; HIG Europe needed him to push the Flip through the Board.

111.     Kraul von-Renner confirmed in correspondence the next day that Van Damme "will be compensated with a bonus for his excellent work."

112.     HIG Europe knew that Fund III was buying for less than had been presented to the Advisory Boards (including representative limited partners), Internal Conflicts Committee, the Maillis Group Board, Dailane, and Mr. Maillis.

113.     On 1 January 2022, Kraul-von Renner emailed Simons regarding discussions with the finance brokers, who arranged financing for the Flip, "We are buying for 7x. We just have to explain [] the delta from the €157.5m external EV to the current €137m."

114.     The Flip transaction was to close on April 4, 2022.  In advance of closing, the HIG Europe team kept Mnaymneh apprised of the progress.  On March 21, 2022, Simons and Kraul-von Renner emailed Mnaymneh to seek his approval of the final deal terms, which included a €38.2 million permanent equity ticket and €1.5 million bridge for coinvestments from HIG Capital.

115.    Mnaymneh asked why the total financing and equity had gone up from what had been presented to the Advisory Board.  He bristled at his team's response:  that SIAT's cash flow had gone up and under the terms of the deal, the cash flows were to go to Fund I and the Maillis co-investors, to whom "we had to slightly concede to . . . get the deal over the line."

116.    In response, Mnaymneh asked "who are these minority co-investors?" and acknowledged that "we owed them a fair deal" but felt that HIG had "overshot" because of the cash flows, even though Mnaymneh was well aware of the unacceptable bid used to peg the price of the deal.  He added "But if that's where we are, okay to proceed."

117.    Kraul-von Renner explained the co-investors were "20% are Michael Maillis, group CEO and Greek deal lawyer. All coinvestors do not reinvest into new deal." Kraul von-Renner assured Mnaymneh they had not overshot, and proceeded to tell him what HIG had not told Plaintiff:

To be rather candid, Sami:

> The deal before was very beneficial for the buyer, ie not paying 4.3€m of cash flows to seller which clearly belonged to seller.  Now it's still very beneficial for the buyer. Basically we acquire SIAT stand-alone for an entry valuation of 7.4x 2021 EBITDA using contingent liabilities at the Remaining structure measured at the maximum level to lower the PP for SIAT.

118.    Mnaymneh did not rescind his approval, which was required to close the deal. Kraul-von Renner confirmed "We will proceed."

119.    The actual EBITDA of SIAT for 2021 was €19.6 million.  Applying the multiplier revealed by Kraul-von Renner, the sale proceeded with SIAT being given an enterprise value of €145 million, which is what Mnaymneh had wanted to use for the Flip at the outset.

120.     Thus, HIG and HIG Europe together did exactly what they knew they were prohibited from doing on account of the fiduciary duty owed to Dailane: they transferred excess value from one fund to another.

121.     Despite HIG Europe's careful manipulation of the price of the Flip, HIG Europe still fell €10 million short of their own internal valuations.  On  April 19, 2024, Jason Wheeler, an employee of HIG Europe, email Simons that "the Q1 2022 valuation is showing an unrealised fair value for Europe LBO I that is €10m greater than has been received".

122.     The actual Enterprise Value of SIAT, as determined by an independent expert, was €280 million at the time of the Flip.  The Enterprise Value of MMS was €12 million, not the €6.4 million of value assigned by HIG.  And while HIG Europe calculated the net debt of the transaction to be -€9.5 million, the net debt had a positive balance of €20.6 million.

## CLAIMS FOR RELIEF

### COUNT I

**Aiding and Abetting a Breach of Fiduciary Duty Against HIG and Mnaymneh**

123.     Dailane incorporates by reference and reallege each of the foregoing allegations as though fully set forth herein:

124.     At all times, HIG47, HIG Europe, HIG, and Mnaymneh were aware that Mr. Maillis was an agent of Dailane and an ultimate beneficial owner of its shareholding.  The MOUs signed by Mnaymneh acknowledged that Mr. Maillis would have a shareholding maintained in a special purpose vehicle; HIG Europe executives referred to Dailane and Mr. Maillis interchangeably in correspondence between themselves and Mr. Maillis throughout the Flip transaction, referring to them collectively as "Dailane/M."

125.    HIG47 and HIG Europe owed a fiduciary duty to Dailane on account of the Fiduciary Agreement, the solicitation and encouragement of Mr. Maillis to place his trust in HIG Europe, and HIG Europe's executives' roles as members of the Board of the Maillis Group.

126.    HIG47 and HIG Europe breached their fiduciary duties to Dailane by deciding to a) use an unacceptably low bid in order to flip the Maillis Group to Fund III, giving it a windfall; b) purposely lowering the purchase price of the Maillis Group by manipulating the net debt and assessing the maximum liabilities of the remaining structure; c) reducing the valuation in Harris Williams' independent valuation report to deceive the Advisory Board into approving an unfair transaction; d) deliberately misleading Mr. Maillis and thus Dailane about the fairness the deal and their own loyalty and good faith as they worked to reduce the amount of proceeds that Dailane and other investors would receive.

127.    HIG had knowledge of the breach because Mnaymneh, its CEO, knew that the Maillis Group was much more valuable than the bids received and knew that the lack of financial history provided by HIG Europe was the main reason for the low bids and also knew that the investors in Fund I and the Maillis Group were owed a fair deal on arm's length terms.

128.    HIG and Mnaymneh substantially assisted and encouraged the breach of fiduciary duty by a) proposing the Flip transaction at a price that was not acceptable from a third party; b) urging HIG Europe and HIG47 to drive the value of the Maillis Group down to fit within the third-party bid; c) instructing HIG Europe/HIG47 to get the deal signed quickly; d) approving the recommendation of the Flip to the Mailis Board knowing that it did not reflect fair value; e) editing the presentation to the Advisory Board to conceal the indefensibility of the purchase price; and f) approving the terms of the deal with full knowledge that HIG Europe/HIG47 had structured it to

achieve the lowest possible purchase price for the Maillis Group at the expense of Dailane and in favor of Fund III, which benefitted HIG.

**PRAYER FOR RELIEF**

Wherefore, Dailane demands a judgment as follows:

A.  A declaration that HIG Europe and HIG47 breached their fiduciary duties to Dailane;

B.  A declaration that HIG Capital and Mnaymneh aided and abetted the breach of those fiduciary duties;

C.  An award of economic, non-economic and any other compensatory damages sustained by Dailane as a result of the breach of fiduciary duty as aided and abetted by HIG and Mnaymneh.

D.  Awarding punitive damages for the intentional misconduct of HIG and Mnaymneh; and

E.  Granting such further relief as the Court deems just and proper.

**SEQUOR LAW P.A.**

*/s/ Joseph B. Rome*

Tara J. Plochocki (application to be admitted *pro hac vice* forthcoming)
650 Massachusetts Ave. NW
Suite 600
Washington, D.C.  20001
tplochocki@sequorlaw.com

Joseph B. Rome (FL Bar No. 122768)
Christopher A. Noel (FL Bar. No 117863)
1111 Brickell Ave.
Suite 1250
Miami, FL  33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
jrome@sequorlaw.com
cnoel@sequorlaw.com
